IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

SHERRY LYNN PETERS,           )
                              )
         Plaintiff,           )
                              )
vs.                           )     Case No. 14-cv-397-TLW
                              )
CAROLYN W. COLVIN,            )
Acting Commissioner of Social Security, )
                              )
         Defendant.           )

## OPINION AND ORDER

Plaintiff Sherry Lynn Peters seeks judicial review of the decision of the Commissioner of the Social Security Administration denying her claim for disability insurance benefits from August 12, 2010 to December 23, 2011 under Title II of the Social Security Act ("SSA"), 42 U.S.C. §§ 416(i), and 423. In accordance with 28 U.S.C. § 636(c)(1) & (3), the parties have consented to proceed before a United States Magistrate Judge. (Dkt. 14). Any appeal of this decision will be directly to the Tenth Circuit Court of Appeals.

## INTRODUCTION

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the

evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## BACKGROUND

Plaintiff, then a 48-year old female, protectively filed for benefits under Title II of the Social Security Act ("SSA"), 42 U.S.C. §§ 416(i), and 423 on December 1, 2010. (R. 107). Plaintiff alleged a disability onset date of May 5, 2010, but amended the date to August 12, 2010, at the hearing before the administrative law judge ("ALJ"). (R. 37, 107). Plaintiff claimed that she was unable to work due to "diabetes, anxiety and neck pain." (R. 70). Plaintiff's claims for benefits were denied initially on July 11, 2011, and on reconsideration on October 21, 2011. (R. 61-65, 70-72). Plaintiff then requested a hearing before an ALJ. (R. 73). The ALJ held the hearing on August 12, 2012, and issued a partially favorable decision on November 16, 2012, awarding benefits beginning December 23, 2011. (R. 32-57, 8-26). Plaintiff appealed this decision on January 8, 2013, citing an onset date earlier than December 23, 2011. The Appeals Council denied plaintiff's request for review; therefore the ALJ's November 16, 2012 decision is the final decision of the Commissioner. (R. 1-3). Plaintiff timely filed an appeal. (Dkt. 2).

**The ALJ's Decision**

The ALJ found plaintiff "not disabled prior to December 23, 2011, but became disabled on that date and has continued to be disabled through the date of this decision" because plaintiff's age category changed to an "individual closely approaching advanced age." (R. 12, 24). Plaintiff did not engage in any substantial gainful activity after her alleged onset date of August 12, 2010. (R. 14). The ALJ found plaintiff had the severe impairments of "major

depressive disorder, diabetes mellitus with neuropathy, cervicalgia status post cervical fusion, status post-left knee surgery, and an anxiety disorder" since the alleged onset date of August 12, 2010. Id. The ALJ determined that plaintiff did not have "an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." (R. 18-9).

The ALJ analyzed plaintiff's mental impairments utilizing the "paragraph B" criteria to determine the degree of her functional limitation. He found moderate restriction in the areas of activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace; with no episodes of decompensation. (R. 19). The ALJ noted that although plaintiff "displayed anxiety symptoms when she was examined by [the] consultative examiner and mental health providers, [ ] her regular physicians reported that [plaintiff] had a normal mood and appearance." Id. The ALJ also considered the fact that plaintiff is able to "leave her home unaccompanied on a weekly basis despite her anxiety," and that although plaintiff claimed that her agoraphobia began during her childhood, she was able to work successfully for over twenty years despite this condition. Id.

The ALJ assigned "little weight" to the IQ scores plaintiff received in 2012, finding that the "diagnosis of mild mental retardation and borderline intellectual function are inconsistent with [plaintiff's] educational and work history." Id. Plaintiff graduated from high school, where she attended regular classes and maintained a "C" average, attended vocational training, and "worked for over 20-years as a rehabilitation-training specialist for the developmentally disabled." Id. The ALJ found "[t]his profile is not supportive of a diagnosis of mild mental retardation or borderline intellectual functioning." Id. The ALJ noted that plaintiff began mental health treatment in 2011, receiving a GAF score of 65 during her initial evaluation. Id. He found

3

that her mental health treatment records support a finding that her condition has remained stable since that time, in contrast to plaintiff's allegations of significant decline, resulting in moderate limitation in functioning. Id.

After reviewing plaintiff's testimony, the medical evidence, and other evidence in the record, the ALJ determined that since August 12, 2010, plaintiff retained the residual functional capacity to

> perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant is able to perform work where interpersonal contact is incidental to the work performed, incidental is defined as interpersonal contact requiring a limited degree of interaction such as meeting and greeting the public, answering simple questions, accepting payments, and making change; complexity of tasks can be learned by demonstration, repetition, or experience; several work variables; judgment within limits; and little supervision for routine tasks and detailed supervision for non-routine tasks.

(R. 19-20). With those limitations, plaintiff was unable to "perform her prior relevant work as a rehabilitating training specialist." (R. 24). Relying on the vocational expert's testimony, the ALJ found that plaintiff could perform other work, such as circuit board assembler and grind machine operator. (R. 25). The ALJ found that, on December 23, 2011, plaintiff's age category changed from 45-49 ("a younger individual") to one closely approaching advanced age. (R. 24-5). This change in age resulted in plaintiff being granted benefits beginning on December 23, 2011 based on "direct application of Medical-Vocational Rule 201.14." (R. 25).

**The Medical Evidence**

    **Physical Evaluations**

According to administrative records beginning in 2007, plaintiff suffered a neck injury at work, which resulted in a herniated cervical disc. Plaintiff underwent surgery to repair this condition on January, 13, 2009. (R. 222-50). At that time, plaintiff had a medical history of hypertension, diabetes, a right knee arthroscopy, and obesity.

In January 2010, plaintiff suffered a left knee injury at work. On May 13, 2010, plaintiff underwent knee surgery to repair a left medial meniscus tear. Plaintiff's surgeon cleared her to return to "work full duty with no restrictions" on July 13, 2010. (R. 193-221, 251-265). Plaintiff was injured in a motor vehicle accident on August 12, 2010, plaintiff's alleged onset date. Records from the subsequent Emergency Room visit indicate plaintiff suffered a cervical sprain. (R. 283-95).

Dr. Kenneth Trinidad, D.O., examined plaintiff on August 13, 2010, August 30, 2010, September 20, 2010, October 4, 2010, November 1, 2010, November 29, 2010, January 3, 2011, and January 31, 2011. (R. 321-25, 416). Plaintiff was diagnosed with cervical and thoracic sprain, right arm radiculitis, and post traumatic headaches. Dr. Trinidad prescribed physical therapy, traction, and ordered an MRI. Id. After therapy and traction failed to yield desired improvement, Dr. Trinidad referred plaintiff to Dr. James C. Mayoza, M.D. at Tulsa Orthopedic Associates, Inc. (R. 328).

Plaintiff underwent an MRI on September 21, 2010 which revealed "[a]t C 3/4 and C 4/5, pathology is minimal, and there is only borderline to minimal foraminal narrowing. The central canal is also borderline narrowed at C 4/5." (R. 331). Additionally Dr. Jeffrey Watts, MD, the radiologist, noted "[a]t C 5/6 there is a more prominent 3 to 4 mm posterior disc protrusion with anterior surface cord contact and subtle flattening. There is mild narrowing of the central canal with only borderline narrowing of the foramina." Id. Lastly, Dr. Watts observed the previous surgery on the cervical disc and opined that "the central canal and foramina are not compromised." (R. 330-31).

Dr. Mayoza evaluated plaintiff and reviewed her MRI on November 18, 2010, and December 16, 2010. He diagnosed plaintiff with "HNP adjacent to previous fusion level at C6-

5

7," and recommended "removal of the hardware at C6-7 and then performing a discectomy at the C5 level with anterior interbody fusion at C5-6 with Mosaic implant. … [A] Mosaic implant with bone graft at the C5-6 level following the hardware removal at C6-7 … will make way for the implantation of the Mosaic plate and bone graft. This surgery is necessary for injuries received in the motor vehicle accident as described by the patient occurring on 08/12/2010." (R. 327).

Dr. Brad Liston, D.O., state certified medical examiner and consultative examiner, evaluated plaintiff in March of 2011. Dr. Liston determined plaintiff had a significantly reduced range of motion in her cervical spine with accompanying pain, reduced right shoulder rotation, negative straight leg raise tests bilaterally, and normal grip strength. (R. 417-426).

In May, 2012, Dr. Trinidad and Dr. Mayoza each submitted a medical source statement stating that plaintiff had a cervical disc herniation at C5-C6, and opining that plaintiff was physically limited to standing and/or walking to four to five hours of eight; frequently lifting and/or carrying less than ten pounds; using her left arm two to three hours of eight a day for reaching, pushing, and pulling, and less than two hours of eight on her right arm; using her left hand two to three hours of eight for grasping, handling, fingering, or feeling, and less than two of eight on her right hand. (R. 521-22). These statements were not based on new evaluations, but were based on the doctors' 2010-2011 respective examinations, and objective testing. (R. 329, 521-22).

**Mental Health Evaluations**

In May 2011, plaintiff began a series of mental health evaluations with a variety of doctors. The first consultative evaluation was with Dennis Rawlings, Ph.D., who examined plaintiff and diagnosed her with major depressive disorder with psychotic features, a panic disorder with agoraphobia, social phobia, obsessive-compulsive disorder, borderline intellectual

functioning and estimated her IQ between 75 and 80. (R. 427-433). On June 21, 2011, Ron Cummings, Ph.D., assessed plaintiff's records and completed a mental RFC form opining that plaintiff could "maintain concentration, persistence and pace for a normal work day and work week." (R. 438). Dr. Cummings noted "the evidence in the record supports a finding of MDIs [medically determinable impairments] in the areas of affective, anxiety and somatoform disorders." (R. 452).

Family and Children's Services provided mental health treatment to plaintiff from July 2011 to August 2012. (R. 481-520). On July 29, 2011, Stevan Lahr, D.O. examined plaintiff determining her attention and concentration were adequate; her motor activity was within normal limits; her thought processes were linear; and her insight and judgment were average. (R. 512). Dr. Lahr diagnosed plaintiff with major depressive disorder, recurrent, severe, and panic disorder with agoraphobia. Id. Additionally, plaintiff had a global assessment functioning score of 65. Id. Plaintiff received medication and treatment for major depressive disorder, panic disorder without agoraphobia, and post-traumatic stress disorder. Id. Mr. Robert Joshua Pillow, BHRS, BS, plaintiff's therapist, noted an eight (8) point decrease in her GAF score within 2011-2012. (R. 573).

In October 2012, Larry Vaught, Ph.D., an agency mental health consultative examiner, evaluated plaintiff. Dr. Vaught diagnosed plaintiff with major depressive disorder, recurrent, severe with psychotic features; panic disorder with agoraphobia; generalized anxiety disorder; and cognitive disorder, NOS, moderate to severe. (R. 584). Additionally, plaintiff scored a 61 on the WAIS-III Full Scale IQ, and Dr. Vaught noted "rule out mild mental retardation" on her form. (R. 576-86).

**ANALYSIS**

Plaintiff appeals the onset date of her disability benefits, arguing that she was disabled beginning on August 12, 2010 rather than December 23, 2011, the date the ALJ awarded benefits. Plaintiff argues for the earlier date based on three claims. First, plaintiff argues that she met Listing 12.05C. Second, plaintiff claims the ALJ failed to properly consider her treating physicians' opinions. Third, plaintiff argues the ALJ failed to properly analyze her credibility. The Court has determined that plaintiff's second allegation of error is dispositive; therefore it will be addressed first.

**Treating Physicians' Opinions**

Plaintiff argues that the ALJ failed to properly weigh the opinions of treating physicians Dr. Trinidad and Dr. Mayoza. (Dkt. 20). Specifically, plaintiff claims that the ALJ "erred when he decided to interpret medical findings and use his layman's opinion instead of those from the treating physician." Id. at 12. In addition, plaintiff alleges the ALJ failed to consider several factors listed in Section 404.1527 and erred in "ignor[ing]" Dr. Liston's prognosis of chronic cervical pain. Id.

The Commissioner counters that "the ALJ reasonably considered all of the medical evidence of record—both the records of Plaintiff's treating providers and the functional assessments rendered by the consultative examiners and state agency medical consultants—in assessing plaintiff's RFC." (Dkt. 23 at 6). The Commissioner further defends the ALJ's decision by reiterating his findings and claiming that contrary to plaintiff's claim, neither Dr. Trinidad's nor Dr. Mayoza's "opinion contains any indication that it was intended to be retrospective to the period during which Plaintiff asserts she was disabled (Pl. Br. 10; *see* Tr. 521-22)." Id. at 6-7.

The proper procedure for evaluating the opinion of a treating physician is well established. "Under the regulations, the agency rulings, and our case law, an ALJ must give good reason in the notice of determination or decision for the weight assigned to a treating physician's opinion." Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003) (citing 20 C.F.R. § 404.1527 (d)(2) and Social Security Ruling 96-2p, 1996 WL 374188 at 5). "The type of opinion typically accorded controlling weight concerns the 'nature and severity of the claimant's impairments including the claimant's symptoms, diagnosis and prognosis, and any physical or mental restrictions.'" Lopez v. Barnhart, 183 F. App'x 825, 827 (10th Cir. 2006) (unpublished). Generally, an ALJ should give more weight to opinions from treating physicians. Watkins, 350 F.3d at 1300 (citing 20 C.F.R. § 404.1527(d)(2)). However, it is error to give the opinion controlling weight simply because it is provided by a treating source. Id.

In determining whether the opinion should be given controlling weight, the analysis is sequential. First, the ALJ must determine whether the opinion qualifies for "controlling weight" by determining whether it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and whether it is consistent with the other substantial evidence in the administrative record. Id. If the answer is "no" to the first part of the inquiry, then the analysis is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. Id. "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." Id.

Second, if the ALJ finds the treating physician's opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the record, it is entitled to deference and must be evaluated in reference to the factors enumerated in 20 C.F.R. § 404.1527. Those factors are:

(1) the length of the treating relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

Watkins, 350 F.3d at 1301 (citing Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001)). The ALJ must give good reasons in his decision for the weight he ultimately assigns the opinion. Id. (citing 20 C.F.R. § 404.1527(d)(2)).

Third, if the ALJ rejects the opinion outright, he is required to "give 'specific, legitimate reasons' for doing so." Id. (citing Miller v. Chater, 99 F.3d 972, 976 (10th Cir. 1990) (quoting Frey v. Bowen, 816 F.2d 508, 513 (10th Cir.1987)). The reasons must be of sufficient specificity to make clear to any subsequent reviewers the weight the adjudicator gave to the treating physician's opinion and the reasons for that weight. See Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir.2007) (holding that an ALJ, in weighing a treating physician's opinion, need not analyze every factor, but must render a decision that is "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.")

In his step two analysis, the ALJ summarized plaintiff's medical records at length, and noted that she had been examined by Drs. Trinidad and Mayoza from August 2010 until January 2011. The ALJ summarized the September 2010 MRI plaintiff received after an automobile accident, authorized by Dr. Trinidad and reviewed by Dr. Mayoza. (R. 14-5). The MRI revealed the following impressions:

> At C 3/4 and C 4/5, pathology is minimal, and there is only borderline to minimal foraminal narrowing. The central canal is also borderline narrowed at C 4/5.

10

> At C 5/6 there is a more prominent 3 to 4 mm posterior disc protrusion with anterior surface cord contact and subtle flattening. There is mild narrowing of the central canal with only borderline narrowing of the foramina.
>
> There has been previous ACDF at C5/6, and the central canal and foramina are not compromised.

(R. 331).

The ALJ noted that upon physical examination and review of plaintiff's MRI, Dr. Mayoza recommended surgery. (R. 15). The ALJ did not note Dr. Mayoza's diagnosis of "HNP adjacent to previous fusion level at C6-7," or his detailed surgical treatment recommendations. (R. 335). Plaintiff did not have the surgery because she no longer had health insurance. (R. 533, 538). The ALJ noted that Dr. Trinidad recommended that plaintiff continue to take her prescribed pain medications, Robaxin, Ultram, and Mobic. (R. 15, 416).

Plaintiff did not receive further care for her neck pain until she presented to Bedlam Longitudinal Clinic in August 2011. (R. 533). Plaintiff received care for her physical problems from medical students under supervision of licensed doctors at Bedlam from August 2011 through January 2012. (R. 523-62). She also received care for her physical issues from a physician's assistant at Morton Clinic from May 2012 through July 2012. (R. 563-70).

The ALJ discussed plaintiff's March 2011 physical consultative examination with Dr. Liston.[1] (R. 15). He stated that plaintiff reported her pain level to be 10 of 10 and that it radiated into her right hand. Id. The ALJ misstated Dr. Liston's report to show "[t]he claimant had normal range of motion in her neck with mild to moderate neck pain." Id. Dr. Liston's report assesses plaintiff with "Chronic Cervical Pain" and lists her only normal cervical range of motion as "flexion," which was listed as 50 of 50; "extension" is listed as 40 of 60; "left rotation" is listed

---

[1] The ALJ incorrectly indicated several times in his decision that Dr. Liston was plaintiff's "primary care physician," instead of a consultative examiner. (R. 21, 22, 23).

as 60 of 80; and "right rotation" is listed as 20 of 80; all with pain, and the level of pain is not indicated. (R. 418, 422).

In his weight discussion, the ALJ gave Drs. Trinidad and Mayoza's opinions "little weight," stating that both doctors last saw plaintiff in 2010 and 2011, and their reports were completed in 2012 with "no evidence showing that the medical assessments made in 2012, were compiled after a current examination of the claimant. Physical examinations performed by the claimant's primary care physician after January 2011 establish that the claimant does not have any neurological deficits, cervical instability, or muscle spasms." (R. 23). The ALJ continued, crediting Dr. Liston's March 5, 2011 consultative evaluation with "normal grip strength in her hands" to further discount these treating physicians' opinions.[2] Id. Next, the ALJ stated that plaintiff's September 2010 MRI "clearly shows that the claimant has only mild abnormalities in her cervical spine with no evidence of even moderate canal stenosis or neural foraminal narrowing," and was "inconsistent with the medical statements." Id. This interpretation appears to be the ALJ's own.

For instance, Dr. Mayoza interpreted plaintiff's 2010 MRI in conjunction with a physical examination on November 18, 2010, and concluded that plaintiff suffered a "HNP [herniated disc] adjacent to previous fusion level at C6-7," and recommended surgery to relieve her symptoms. (R. 329). Dr. Mayoza even specifically noted the MRI as support for his opinion. (R. 521). Further, Dr. Mayoza's opinion clearly states at the top of the form "Medical Source Opinion of Residual Functional Capacity as of 12/16/10," which was plaintiff's last appointment date. Id. Based on the MRI, Dr. Mayoza recommended surgery.

---

[2] See *supra* at 11, n.1.

Likewise, Dr. Trinidad based his diagnoses of plaintiff's need for surgical intervention on the 2010 MRI. (R. 521-22). Dr. Trinidad's opinion is also titled, "Medical Source Opinion of Residual Functional Capacity as of 01/31/11." (R. 522).

Finally, Dr. Liston's consultative exam was performed two months after plaintiff last visited Dr. Trinidad, and three months after she last visited Dr. Mayoza. (R. 417-22). Dr. Liston's cervical spine range of motion test results support the opinions of Drs. Mayoza and Trinidad, yet the ALJ failed to discuss Dr. Liston's findings of reduced cervical range of motion with pain, and miscast his opinion as finding no "cervical instability." (R. 23, 422). Thus, the ALJ did not cite any medical opinion in support of his "interpretation" of the MRI.

"In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." Robinson v. Barnhart, 366 F.3d 1078, 1082 (10th Cir. 2004) (quoting McGoffin v. Barnhart, 288 F.3d 1248, 1252 (10th Cir.2002)). The Court will not re-weigh the evidence, but the Court will evaluate whether the ALJ's decision followed the proper standards of review and whether the decision is supported by substantial evidence. Grogan, 399 F.3d at 1261.

The Court finds that the ALJ's interpretation of the 2010 MRI and his analysis of the treating physician opinions of Drs. Trinidad and Mayoza are not supported by substantial evidence and therefore must be remanded for proper analysis.

**Listing 12.05**

Listing 12.05 requires a claimant to establish "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the

developmental period; *i.e.* the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.[3] So, a claimant must establish two things to meet Listing 12.05: (1) that he or she has significantly subaverage general intellectual functioning with deficits in adaptive functioning; and (2) that this functioning manifested itself before the age of 22. If both of these requirements are met, a claimant can establish that he or she meets the level of severity required by showing that paragraph A, B, C, or D is satisfied.

Plaintiff only argues that the ALJ's "finding that [her] impairments do not meet Listing 12.05C is not supported by substantial evidence." (Dkt. 20). Plaintiff fails to argue or provide any evidence that she satisfied the first two prongs of the Listing requirement; therefore, she has failed to meet her burden. See Wall v. Astrue, 561 F.3d 1048, 1062 (10th Cir. 2009) ("[T]he claimant bears the burden to prove her disability.").

Further, even if the ALJ had found that plaintiff met the first two requirements of Listing 12.05, he still found evidence that undercuts her claim of meeting the paragraph C criteria of Listing 12.05.

Paragraph C is met when a claimant has "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05C. Plaintiff argues that she meets the IQ requirement of Listing 12.05C, as evidenced by the recorded IQ score during her 2012 consultative examination with Dr. Vaught. However, "[i]t is within the

---

[3] All citations to the Code of Federal Regulations (C.F.R.) are to the 2012 edition. While recent changes to the C.F.R. are minimal, the Court uses the 2012 version to avoid "retroactive rulemaking." Cherry v. Barnhart, 327 F. Supp. 2d 1347, 1360 (N.D. Okla. 2004).

province of an ALJ to make factual determinations regarding the validity of an IQ score, that is, whether the IQ score is 'an accurate reflection of [a claimant's] intellectual capabilities.' In doing so, an ALJ may 'consider other evidence in the record.'" Flores v. Astrue, 285 F. App'x 566, 568-69 (10th Cir. 2008) (unpublished)[4] (quoting Lax v. Astrue, 489 F.3d 1080, 1087 (10th Cir. 2007)).

In support of his finding that plaintiff's IQ score is not an accurate reflection of her intellectual abilities, the ALJ cited plaintiff's admission that she graduated high school, attended regular classes, began vocational training, and worked for twenty years as a rehabilitation training specialist for developmentally disabled clients. (R. 19, 427). The ALJ noted that as a rehabilitation specialist, plaintiff cooked, assisted with daily activities, and handled patients' personal tasks. (R. 21). The record further demonstrates that plaintiff's duties included organizing client households, including bills; ordering and distributing medication; shopping for groceries; assisting clients with paperwork; bathing, and dressing clients; and engaging in meal preparation, and clean up. (R. 137, 141). Finally, Dr. Vaught did not diagnosis plaintiff with "mental retardation," but stated "rule out mild mental retardation." (R. 584).

Based on the foregoing, the Court finds that the ALJ did not commit reversible error when he found that plaintiff did not meet or medically equal a Listing.

## CONCLUSION

For the reasons set forth above, the Commissioner's decision in this case is **REVERSED AND REMANDED**. On remand, the ALJ should conduct a proper analysis of the opinions of treating physicians, Dr. Trinidad and Dr. Mayoza, taking care to provide sufficient explanation for the weight given to those opinions. The ALJ may also reevaluate the other medical source

---

[4] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

opinions, if necessary. The Court finds no reversible error in the other aspects of this case, particularly with regard to Listing 12.05C finding. <u>See</u> <u>Wells v. Colvin</u>, 727 F.3d 1061, 1066 (10th Cir. 2013) (reversing and remanding for re-evaluation of physical limitations and finding no reversible error in other aspects of the ALJ's decision).

    SO ORDERED this 28th day of September, 2015.

_____
T. Lane Wilson
United States Magistrate Judge